$12,533 × [contractual interest rate = $748
from 3/31/99 to 10/28/99,
compounded monthly]

(3) Total Interest

$12,533 − $9,359 = $3,174

$748 + $3,174 = $3,922.

Now that all outstanding issues have been resolved, a judgment should be entered and the Clerk of the Court is directed to close these cases.

Accordingly Krumme is awarded $3,922 interest on Skadden's expert fees.

## V. Conclusion

For the foregoing reasons, I decline to cap the award of attorneys' fees at one-third the amount in controversy and instead award plaintiffs the full amount of attorneys' fees requested, less twenty percent and including fees incurred in litigating the terms of the EPI fee provision. In addition, I award Krumme $3,922 in interest on the expert fees charged by Skadden. Accordingly, the Magistrate's fee award is modified as follows:

### DISTRICT COURT'S MODIFIED FEE AWARD

| CASE | COUNSEL | FEES | COSTS | INTEREST | TOTAL |
|------|---------|------|-------|----------|-------|
| Krumme | Krumme | $121,350 | $814 | $212,867 | $335,031 |
| | Morgan Lewis | $683,551 | $46,660 | $713,749 | $1,443,960 |
| Allen | Krumme | $319,860 | $5,830 $9,359 | $183,328 $3,922 | $522,299 |
| | Chadbourne | $1,503,699 | $91,583 | $903,888 | $2,499,170 |

**HARTFORD FIRE INSURANCE COMPANY, a/s/o Trek Bicycle Corp., Plaintiff,**

v.

**M/V "OOCL BRAVERY," her engines, tackle, boilers, etc.; Orient Overseas Container Line (UK) Ltd.; OOCL (EUROPE) Ltd.; Orient Overseas Container Line; OOCL (USA) Inc., Defendants.**

No. 98 CIV. 347(DFE).

United States District Court, S.D. New York.

Nov. 19, 1999.

David L. Mazaroli, Law Offices of David L. Mazaroli, New York, NY, for Plaintiff.

Thomas L. Tisdale, Tisdale & Lennon, LLC, New York, NY, for Defendant.

## MEMORANDUM AND ORDER

EATON, United States Magistrate Judge.

This lost cargo case is assigned to me for all purposes pursuant to 28 U.S.C. § 636(c) and the parties' consent given in July 1999. The first-named defendant (a ship) has apparently never been served. The other defendants are represented by Tisdale & Lennon, LLC. They say (and this is undisputed) that two of the defendants—OOCL (Europe) Ltd. and OOCL (USA) Inc.—are agencies acting on behalf of the second named defendant Orient Overseas Container Line (UK) Ltd. (re-

ferred to as "OOCL (UK)"). They also say that the fourth-named defendant—Orient Overseas Container Line—is merely a trade name for transportation provided by, among others, OOCL (UK). Hence they often refer to all four defendants as "the defendant OOCL (UK)." However, I will refer to the defendants in the plural.

The defendants deny that our case falls within the admiralty and maritime jurisdiction. But it indisputably falls within our Court's diversity jurisdiction. Plaintiff is incorporated in Connecticut and has its principal place of business there; none of the defendants has Connecticut as its principal place of business or its state of incorporation. See plaintiff's Rule 56.1 Statement, ¶¶ 1–3 (undisputed).

On May 11, 1999, plaintiff Hartford Fire Insurance Company ("Hartford") served a motion for summary judgment, including: (1) the Notice of Motion and the annexed affidavit of David L. Mazaroli ("Maz.Aff.") with exhibits 1 through 37 ("Pl.Exh."); (2) a Rule 56.1 Statement ("Pl. 56.1 Stat."); and (3) a memorandum of law ("Pl. Memo.").

On May 28, the defendants served: (4) a Notice of Cross–Motion for Summary Judgment; (5) the affidavit of Thomas L. Tisdale ("Tis.Aff.") with exhibits 1 through 3 ("Def.Exh."); (6) a memorandum of law ("Def.Memo."); and (7) the defendants' Rule 56.1 Statement ("Def. 56.1 Stat.").

On June 14, plaintiff served: (8) the reply affidavit of David L. Mazaroli ("Maz. Reply Aff.") with exhibits 38 through 42 (more "Pl. Exh."); (9) a Rule 56.1 Reply Statement ("Pl. 56.1 Reply Stat."); and (10) a reply memorandum of law ("Pl. Reply Memo.").

On June 25, the defendants served: (11) the reply affidavit of Mr. Tisdale ("Tis. Reply Aff.") with exhibits A and B (more "Def. Exh.") and (12) a reply memorandum of law ("Def. Reply Memo.").

On August 11, at my request, plaintiff delivered to my chambers the original Bill

of Lading and an enlarged copy of the "Terms and Conditions" of the Bill of Lading.

On August 26, at my request, plaintiff submitted a copy of Deposition Exhibit A–1 ("Pl.Exh. A–1"), which is discussed in Pl. Exh. 2 at pp. 7–9, 45–46.

On October 7, I issued a Memorandum and Order directing the parties to submit supplemental briefs on three topics:

1.  Does COGSA govern the overland portions of the intermodal carriage?

2.  Were the defendants immune from liability during the period when the cargo was on land and in the possession of a subcontractor?

3.  If defendants' liability was limited by CMR, or was eliminated by Clause 4, did Trek Bicycle Corp. have a reasonable opportunity to pay a higher charge and to reinstate higher liability?

Plaintiff's 10/18/99 supplemental brief will be referred to as "Pl. Supp. Memo." and the defendants' 10/29/99 supplemental brief will be referred to as "Def. Supp. Memo." The defendants also submitted the 10/28/99 declaration of Luc Wijffels, their Belgian attorney, who makes conclusory arguments of law.

After reviewing all of these documents, I grant summary judgment against defendants Orient Overseas Container Line (UK) Ltd., OOCL (Europe) Ltd., Orient Overseas Container Line, and OOCL (USA) Inc. I deny the defendants' cross-motion.

### FACTUAL BACKGROUND

Plaintiff Hartford is the subrogated insurer of a 301–package shipment of bicycles and framesets owned by plaintiff's subrogor, Trek Bicycle Corp. ("Trek"). This shipment was stolen while it was in the custody of the defendants and/or their agents during intermodal carriage (by water and land) from Wisconsin to the Netherlands. *See* Pl. 56.1 stat. ¶¶ 1 and 4; Pl. Exh. 2, pp. 42–43; Pl. Exh. 21, ¶ 2.

In August 1996, OOCL (USA) Inc. and Trek contracted for the transportation of bicycles, parts and accessories over a twelve-month period. *See* Pl. Exh. 3; Pl. Exh. A–1. The terms and rates for each shipment were contained on page 3 of the contract. With respect to the shipment at issue, the parties agreed that the bicycles and framesets would be shipped door-to-door from Oconomowoc, Wisconsin to Spijkenisse, the Netherlands, at a cost of $2,865.00. *See* Pl. Exh. 1; Pl. Exh. 2, pp. 8–10, 45–46; Pl. Exh. 3; Pl. Exh. A–1.

In October 1996, OOCL (USA) Inc., as agent for OOCL (UK)(the "Carrier"), issued a through Bill of Lading for the 301–package shipment of bicycles and framesets. *See* Pl. Exh. 1. The Bill of Lading specifies on its face: (1) the type of goods (i.e., "ONE X 40 HC. CONTAINER STC: 301 PACKAGES OF BICYCLES AND FRAMESETS"); (2) that the freight was prepaid; (3) that the goods would be shipped door-to-door (referred to as "D/D" on the Bill of Lading) from Trek's Oconomowoc facility to the consignee's warehouse in Spijkenisse; (4) that the goods would be transported on the British shipping vessel "OOCL Bravery" from a port in Montreal to a port in Antwerp; (5) that the "place of delivery by [the] participating carrier/carrier" would be the consignee's Spijkenisse warehouse; and (6) that the shipment, which was sealed by the shipper, contained 301 packages of bicycles and framesets weighing 10,259 pounds (4653 kilograms). *See* Pl. Exh. 1. The reverse side of the Bill of Lading contained, in very fine print, 29 terms and conditions, many with subparts. The sections applicable to the parties' motions will be discussed in the Legal Analysis section of this Order.

In October 1996, Trek's employees loaded the 301 packages of bicycles and framesets into container OOLU5530016, which was then picked up from Trek's Oconomowoc facility by OOCL (UK) or entities acting on its behalf. *See* Pl. Exh. 2, pp. 14,

22–24, 37–38; Pl. Exh. 6. The container was driven to Montreal, where it was stowed on the M/V "OOCL Bravery" for the ocean portion of the intermodal carriage. *See* Pl. Exh. 2, p. 10.

After arriving at the port in Antwerp, Belgium, the container was discharged into the custody of OOCL (UK)'s subcontractor, DeBock Gebr. Transport N.V. ("De Bock"), a trucking company which had an ongoing exclusive road haulage contract with OOCL (UK). *See* Pl. 56.1 Stat. ¶¶ 13, 15–17; Def. 56.1 Stat. ¶ 4; Pl. Exh. 13, pp. 12–14. DeBock subcontracted the transport of the loaded container from Antwerp to Spijkenisse to a trucking company called Groeninghe, N.V. *See* Pl. Exh. 13, pp. 33–34, 45; Pl. Exh. 14.

Instead of storing the loaded container in a secured yard, depot or warehouse the night before its scheduled delivery to the consignee, the truck driver assigned by DeBock and Groeninghe (a Mr. John van Camp) left the truck carrying the container unattended on a public street near his home in Antwerp. Neither the truck nor the container were equipped with antipilferage alarms; however, in a statement to plaintiff's surveyor, Mr. van Camp claimed that he locked the truck cabin, turned off the battery key, and used a steering lock bar. It should be noted, however, that his statement suggests that he kept the key to the steering lock bar inside the locked truck. *See* Pl. Exh. 23.

On the morning of October 30, Mr. van Camp discovered that his truck had been stolen, and he notified the police and the defendants of the theft. *See* Pl. 56.1 Stat. ¶ 21; Def. 56.1 Stat. ¶ 8; Pl. Exh. 13 pp. 20, 25–27; Pl. Exh. 14; Pl. Exh. 23. OOCL (UK), or entities acting on its behalf, informed the intended consignee (a third-party warehouse which supplied bicycles and framesets to Trek's European subsidiaries) that the cargo was missing and could not be delivered. *See* Pl. 56.1 Stat. ¶ 22; Pl. Exh. 9; Pl. Exh. 13 pp. 21, 25–27; Pl. Exh. 14.

On October 31, the truck's tractor was found with the cabin door and ignition forced, and the steering wheel cut. The trailer and empty container were found a few days later. *See* Pl. Exh. 23. In about two weeks, police recovered 29 of the bicycles for Trek, and the majority of them were in good condition. *See* Def. 56.1 Stat. ¶ 8; Pl. Exh. 23. The rest of the bicycles and framesets have not been recovered. *See* Pl. Exh. 2, p. 44.

In November 1996, the defendants presented a claim to DeBock for the full value of the missing cargo. OOCL (Benelux) N.V. wrote to De Bock:

> We consequently hold you responsible for the loss of the container and its cargo.
>
> It should be pointed out that we will not be pleased if you invoke the limitation of liability as described under the CMR terms and conditions, since the container was on the public road at the time of the theft, without any supervision or guard. We therefore hold you responsible for the full value of the cargo....

*See* Pl. Exh. 16; Pl. Exh. 13, pp. 26–27. OOCL (UK) later commenced an action against DeBock and Groeninghe in the Antwerp Civil Court. *See* Pl. 56.1 Stat. ¶ 23; Pl. Exh. 20. OOCL (UK) intends to remit to Hartford the net proceeds of any judgment or of any settlement approved by Hartford. *See* Tis. Reply Aff. ¶¶ 2–4.

In November 1996, Trek also filed a claim for the missing bicycles and framesets. It sought the full value of the shipment from its insurance company. *See* Pl. Exh. 10. In April 1997, Hartford paid Trek $135,602.00, which was the insured value of the cargo. *See* Pl. Exh. 2, p. 44–45; Pl. Exh. 8; Pl. Exh. 12. In April 1998, Hartford, as the subrogated insurer of the shipment, filed this suit against the defendants.

## LEGAL ANALYSIS

### 1. *Applicable Law*

In my October 7 Memorandum and Order, I directed the parties to submit sup-

plemental briefs on the issue of which law governs the defendants' liability for the overland portion of the intermodal carriage. Plaintiff, who initially favored the Carriage of Goods by Water Act of Canada ("COGWA"), now agrees with my preliminary view that the case is governed by the Carriage of Goods by Sea Act of the United States ("COGSA"). Clause 23 of the Bill of Lading (the "Clause Paramount") states:

> 23) **CLAUSE PARAMOUNT.** *All carriage under this Bill of Lading to or from the United States of America shall have effect subject to the provisions of COGSA* (or if this Bill of Lading governs carriage to or from Canada, it shall have effect subject to COGWA) which shall be deemed to be incorporated herein.... *Except as otherwise provided herein, COGSA ... shall govern the Goods before loading on board and after discharge from the Vessel and while subject to this Bill of Lading.*

*See* Pl. Exh. 1, ¶ 23 (emphasis added).

The defendants, on the other hand, maintain that COGSA governs "all periods before loading and after discharge from the vessel and while subject to this Bill of Lading '*except as otherwise provided herein.*'" *See* Def. Supp. Memo., p. 5 quoting Cl. 23 (my emphasis added). The defendants submit that Clause 23 should be read in conjunction with Clause 4 of the Bill of Lading, which states (in part):

> ... [W]ith respect to all other transportation the Carrier agrees to procure transportation of the Goods for and on behalf of the Merchant in accordance with its tariff(s) and those of Participating Carriers and without waiver of any defenses or exemptions provided by law, if applicable, from the Place of Receipt to the Place of Delivery, and it shall have the right at its discretion to use any mode of transport in addition to the named Vessel(s), or their substitutes and to arrange participation by other Carriers to accomplish such transportation. *Each stage of the transport shall be governed according to any law and tariffs applicable to such stage. The care, custody and carriage of the Goods during any period in which a Participating Carrier or its contractor or agent is in possession of the Goods shall be the sole responsibility of the Participating Carrier and not the Carrier.*

*See* Pl. Exh. 1 (emphasis added). The defendants further submit that at the time of the loss, the Convention on the Contract for the International Carriage of Goods by Road ("CMR") was the applicable law:

> [In Clause 4] OOCL (UK) specifically states that it will not be responsible for the cargo when it does not have actual custody of the cargo. In that event, the shipper/consignee's remedies for loss or damage are against the Participating Carrier (here, the trucker in Antwerp) and not against OOCL (UK) because OOCL (UK) is merely acting as the shipper/consignee's agent in selecting a trucker. Furthermore, if OOCL (UK) is negligent in the selection of the trucker, pursuant to Clause 4 of the Bill of Lading, its liability is limited to the amount of the limitation of liability contained in the CMR Convention, a compulsorily applicable statute governing the trucking of the cargo between European countries which are signatories to the convention.

*See* Def. Supp. Memo. p. 2.

After reviewing the parties supplemental briefs, I find that: (a) COGSA applies to the entire intermodal carriage, including the period of time when the goods were in the trucker's custody; and (b) the CMR limitation cannot be used to limit the defendants' liability.

Both COGSA and the CMR limit a carrier's liability to a maximum amount unless the shipper declares a higher cargo value and pays the carrier's ad valorem freight charge. Under COGSA, a carrier's liability is limited to a maximum of $500.00 per package. Thus, in the instant case, the

maximum amount plaintiff can recover under COGSA is $137,331.67:

301 packages of bicycles
−  29 recovered bicycles
272 packages of bicycles
×  $500.00
$136,000.00
+  $1,331.67 for repairs to bicycles
$137,331.67 plus interest

Under the CMR, the limit would be calculated by multiplying the weight of the shipment by 8.33 SDR (Standard Drawing Rights) by the value of one SDR on the date of the loss:

4,653 kg for the total shipment
−  406 kg for the 29 recovered bicycles
4,247 kg
×  8.33 SDR
×  $1.44405 U.S. dollar to SDR exchange
rate on October 30, 1996
$51,086.89.
+  $1,331.67 for repairs to bicycles
$52,418.56 plus interest

Under COGSA, the award should be slightly less than the COGSA maximum. The parties agree that the market value of the lost cargo was $121,943.07 and that the repair costs were $1,331.67. The combined total, $123,274.74 plus interest and costs, is the amount I would award under COGSA.

■ The defendants attempt to circumvent COGSA by claiming that COGSA governed the entire intermodal carriage except during the time when the goods were in the subcontractor's custody—a time when they say I should apply the lower CMR limit. But COGSA prohibits a carrier from inserting clauses into a Bill of Lading that lessen liability:

Any clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to or in connection with the goods, arising from negligence, fault, or failure in the duties and obligations provided in this section, or lessening such liability otherwise than as provided in this chapter, shall be null and void and of no effect.

46 U.S.C.App. § 1303(8). Indeed, the Second Circuit has held that COGSA "allows freedom of contract outside its provisions only if a carrier's liability is increased, not reduced." *General Elec. Co. v. MV Nedlloyd,* 817 F.2d 1022, 1024 (2d Cir.1987), *cert. denied,* 484 U.S. 1011, 108 S.Ct. 710, 98 L.Ed.2d 661 (1988). *See also Encyclopaedia Britannica, Inc. v. S. S. Hong Kong Producer,* 422 F.2d 7, 12 (2d Cir. 1969) (COGSA "allows a freedom of contracting out of its terms, but only in the direction of increasing the shipowner's liabilities, and never in the direction of diminishing them")(internal citation omitted).

Defendants argue as follows:

Despite the fact that COGSA has been extended by the [B]ill of [L]ading, that extension can be, and has been, properly limited to OOCL (UK)'s period of actual custody by the term "except as otherwise provided". For all other periods, i.e., when the cargo is in the custody of a Participating Carrier and not OOCL (UK), it is acting as an agent and its responsibilities are limited to those of an agent and not of a carrier.

\*  \*  \*  \*  \*  \*

... [the] decisions cited by OOCL (UK) clearly establish that such a limitation of liability can validly exist[ ] and that OOCL (UK)'s [B]ill of [L]ading provisions are valid and enforceable.

Def. Supp. Memo. p. 2.

The two Southern District cases cited by the defendants are easily distinguishable from the case at bar. *See El–Khateib v. S.S. Eurofreighter,* 1980 AMC 893 (S.D.N.Y.1979) and *Bristol Myers v. Pioneerland,* 1957 AMC 50 (S.D.N.Y.1956). Those cases involved Bills of Lading which specifically limited both the responsibility *and liability* of the carrier—but in our case, Clause 4 of the Bill of Lading limits only the responsibility. In *Bristol Myers,* the Bill of Lading stated that (a) the carrier "shall not be liable in any capacity whatsoever" for loss or damage that occurs "while the goods are not in the actual custody of the Carrier" and (b) the carrier "shall not be under any responsibility

whatsoever as bailee, forwarder, carrier or otherwise until the goods are delivered to it [the carrier] as provided above at the port of transshipment and loading." 1957 AMC at 52. In *El–Khateib*, the Bill of Lading stated that (a) the carrier "shall not be liable in any capacity or under any circumstances whatsoever for any loss . . . or damage to the goods occurring after their discharge from the ship", (b) the carrier's "responsibility . . . shall be limited to the transportation of said goods over [the carrier's] own line", and (c) the carrier "shall not be liable for any . . . loss of or damage to the goods occurring while the goods are not in the [carrier's] custody." 1980 AMC at 893.

■ In my October 7 Memorandum and Order, I asked the defendants to show whether Trek Bicycle had a reasonable opportunity to pay a higher charge to obtain a higher liability against the carrier— in the event I found that the CMR applied to the overland portion. *See New York, N.H. & Hartford R. Co. v. Nothnagle*, 346 U.S. 128, 135–36, 73 S.Ct. 986, 990, 97 L.Ed. 1500 (1953); *General Elec. Co.*, 817 F.2d at 1028–29. The defendants failed to offer any such showing. They say that the issue was not raised by plaintiff in its opposition to their cross motion, and that "the court is confusing a COGSA [provision?] which is not applicable to this foreign legislation." Def. Supp. Memo. p. 7.

The defendants claim that the CMR did not require them to provide Trek with notice that the CMR limit could apply:

[T]he CMR Convention permits the shipper and road hauler to agree on a higher value for the cargo upon the payment of a higher freight rate. However, there is no provision in the CMR Convention requiring the road hauler or carrier to notify the shipper of that possibility. Essentially, there is no provision in the CMR which is comparable to the latter portion of COGSA's section 1304(5) (46 USC § 1304(5)). Thus, OOCL (UK)'s Bill of Lading clearly satisfies the COGSA requirements. There

are no similar CMR requirements which must be satisfied.

Def. Supp. Memo. pp. 7–8. The defendants assert that they were required to notify Trek only about the COGSA limit— which they did in the Bill of Lading.

The defendants allege that Trek was aware of the likelihood of a very low limit on the carrier's liability (i.e., the CMR limit rather than the COGSA limit) because Trek paid for higher coverage when it insured the shipment with Hartford Fire Insurance Company. *See* Def. Supp. Memo., p. 8. They point to one sentence in *Nippon Fire & Marine Ins. Co. v. M.V. Tourcoing*, 167 F.3d 99, 102 (2d Cir.1999), which found that the shipper "appreciated the substantial likelihood of a relatively low limit on the carrier's liability." However, the defendants neglect to mention that the "relatively low limit" was the COGSA limit.

In *Nippon Fire*, the plaintiff sought to recover $1,186,467 for damages which occurred to its insured's packages while they were unloaded from the defendant's vessel. Instead of the requested amount, Judge Cedarbaum awarded $3,750 in accordance with the COGSA limit of $500 per package. The Second Circuit affirmed Judge Cedarbaum for two reasons—(1) the Bill of Lading said "DECLARED VALUE (SEE CLAUSE 11 RE: $500 LIMIT)" and hence the shipper was given a fair opportunity to declare a value that was higher than the COGSA limit but it did not do so; (2) the shipper's purchase of insurance showed "that it appreciated the substantial likelihood of a relatively low limit [namely, the COGSA limit of $500 per package, spelled out in capital letters.]"

I cannot permit the defendants to take advantage of the lower CMR liability limit when the shipper was not provided with a fair opportunity to declare a value higher than the CMR limit. There are no references to the CMR in (a) the Bill of Lading or (b) the August 1996 contract between Trek and defendants. The only contract

that incorporates the CMR is the April 1995 subcontracting agreement between the defendants and DeBock; Trek was not a party to it, and hence it is not binding on the plaintiff. Where a separate carrier transports goods from the port of discharge to the designated place of delivery, this does not constitute an independent contract for the overland portion of the trip. Instead, such carriage is governed by the incorporated COGSA provisions of the Bill of Lading. *See Junior Gallery, Ltd. v. Neptune Orient Lines, Ltd.*, 1998 WL 770558, at *5, n. 3 (S.D.N.Y. Nov.3, 1998) (Chin, J.), *citing, Miller Export Corp. v. Hellenic Lines, Ltd.*, 534 F.Supp. 707, 710–711 (S.D.N.Y.1982) (Conner J.).

I note that the defendants, when looking after their own interests, are opposing the trucker's attempt to invoke the CMR limit, even though the CMR seems to have governed the trucking agreement. The defendants warned the trucker:

> [W]e will not be pleased if you invoke the limitation of liability as described under the CMR terms and conditions, since the container was on the public road at the time of the theft, without any supervision or guard. We therefore hold you responsible for the full value of the cargo.

Pl. Exh. 16.

2. *The plaintiff is entitled to summary judgment*

■ Accordingly, I will apply COGSA. To establish a prima facie case against the defendants under COGSA, plaintiff must demonstrate that the loss occurred while the goods were in the defendants' custody. *Junior Gallery, Ltd. v. Neptune Orient Lines, Ltd.*, 1998 WL 770558, at *5 (S.D.N.Y. Nov.3, 1998) (Chin, J.) (citing cases). To meet this burden, plaintiff must prove: (1) delivery of the goods to the carrier in good condition; and (2) either the carrier's loss of the cargo or outturn of the goods in damaged condition. *Ibid.* Plaintiff has proven both elements,

and the defendants do not dispute this. *See* Def. Memo. p. 8.

■ Accordingly, the burden shifts to the carrier to show that the loss or damage falls within one of the COGSA exceptions set forth in 46 U.S.C.App. § 1304(2). *See Westway Coffee Corp. v. M.V. Netuno*, 675 F.2d 30, 32 (2d Cir.1982).

46 U.S.C.App. § 1304(2) lists seventeen exceptions to the general rule that a carrier should be held responsible for loss or damage to a shipment. Seven of these exceptions were raised in the Seventh Affirmative Defense in the defendants' answer (Pl.Exh. 22, p. 4)—but only one exception (subpart q) is seriously pressed by the defendants in their summary judgment papers. 46 U.S.C.App. § 1304(2)(q) states (with my emphasis):

> Neither the carrier nor the ship shall be held responsible for loss or damage arising from—

> (q) Any other cause arising without the actual fault or privity of the carrier and without the fault or neglect of the agents or servants of the carrier, but the *burden of proof* shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier *nor the fault or neglect of the agents* or servants of the carrier *contributed* to the loss or damage.

For the reasons set forth below, I conclude that no rational fact-finder could find that the defendants' evidence proves that neither the fault nor the neglect of the carrier and/or its agents contributed to the loss.

i. *DeBock, Groeninghe and van Camp were the defendants' agents*

■ OOCL (UK) alleges that it is not liable to plaintiff under the Bill of Lading for "any loss or damage occurring to the cargo while the cargo is in the custody of the Participating Carrier [referring to the inland transporters, DeBock and Groeninghe]." *See* Def. 56.1 Stat. ¶ 15. The

defendants cite to Clause 4 of the Bill of Lading (with my emphasis):

Each stage of the transport shall be governed according to any law and tariffs applicable to such stage. *The care, custody and carriage of the Goods during any period in which a Participating Carrier or its contractor or agent is in possession of the Goods shall be the sole responsibility of the Participating Carrier and not the Carrier.* As to all other carriage covered by this Bill of Lading, if it cannot be established where the damage or loss occurred, it shall be deemed as between the Merchant and the Carrier or any Participating Carrier that the loss or damage occurred aboard the Vessel during ocean carriage and the Carrier's liability shall be determined in accordance with Clause 23 hereof.

*See* Pl. Exh. 1.

Plaintiff responds that Clause 4 refers only to the "responsibility" and not the "liability" of the participating carrier. *See* Pl. Reply Memo. p. 5. Plaintiff notes that Clause 6 uses both words ("responsibility and liability") and that Clauses 8, 9(2), 10, 24 and 25 use the word "liability" to discuss the payment by the Carrier for cargo loss, etc. Plaintiff claims that Clause 4's failure to use the term "liability" must be assumed to have been intentional. Plaintiff cites Judge Mukasey's opinion in *St. Paul Fire and Marine Ins. Co. v. Thypin Steel Co., Inc.,* 1999 WL 163562, at *3, n. 2 (S.D.N.Y. March 24, 1999):

Omission of a term in one provision of a contract but inclusion of that term in another provision must be assumed to have been intentional under accepted canons of contract construction.

■ I agree with plaintiff that Clause 4 of the Bill of Lading is insufficient to exempt the defendants from liability. Where a carrier arranges for inland transportation, the inland transporter "is clearly the subcontractor of or agent" of the carrier. *Asahi Am., Inc. v. M/V Arild Maersk,* 602 F.Supp. 25, 27 (S.D.N.Y.1985). As the carrier's agent, the inland transporter "is

not liable ex contractu for the breach of the contract between its disclosed principal and a third party, even when the breach was the result of its own wrongful act." *Leather's Best, Inc. v. S.S. Mormaclynx,* 451 F.2d 800, 808 (2d Cir.1971). Instead, the carrier remains liable because it has "a legal obligation to protect the goods" until the shipment is delivered to the consignee in accordance with the Bill of Lading. *Insurance Co. of North Am. v. M/V Savannah,* 1998 AMC 1029, 1033 (S.D.N.Y.1995) (holding that the carrier was liable for the damage to the shipment because its agent was performing the carrier's obligation to move the shipment from the wharf to the warehouse when the accident occurred). *See also Schiess–Froriep Corp. v. S.S. Finnsailor,* 574 F.2d 123, n. 6 (2d Cir. 1978); *Leather's Best, Inc. v. S.S. Mormaclynx,* 451 F.2d 800, 811–812 (2d Cir.1971).

Accordingly, I find that DeBock, Groeninghe and van Camp were the defendants' agents at the time of the loss. In view of this finding, it is unnecessary to discuss the evidence about whether it was reasonable for the defendants to hire DeBock as their exclusive subcontractor. Instead, I will discuss the evidence that the defendants' agents were negligent during the period of time when the loaded container was in their custody.

ii. The negligence of the defendants' agents *contributed to the loss*

■ A door-to-door contract of carriage requires the carrier to deliver the goods from the shipper's door to the consignee's door, and "[t]his duty of proper delivery is not … conterminous with the duty to transport." *Caterpillar Overseas, S.A. v. S.S. Expeditor,* 318 F.2d 720, 723 (2d Cir.1963); Pl. Exh. 36. Proper delivery "requires, at the very least, the selection of, and the discharge of the goods" onto a "fit" and secure truck, such as one that is equipped with anti-pilferage devices, and if the carrier (or its agent) fails to do so, it can be held liable for any negligence that occurs during the course of

the failed delivery. *Caterpillar,* 318 F.2d at 724. Moreover, where the carrier is aware that its subcontractor may not safeguard the goods while they are in its possession, the carrier's responsibility for any loss or damage to the cargo will be "coexistent" with the subcontractor's, "since it selected [the subcontractor as its trucking company] and discharged the cargo into [the subcontractor's] custody." *Cameco, Inc. v. S.S. Am. Legion,* 514 F.2d 1291, 1295 (2d Cir.1974).

In the case at bar, the defendants agreed with DeBock that the trucker could exclude the following security conditions from the DeBock subcontracting agreement:

— Containers must never be parked in a lay-by or on the road side without t[h]e driver in attendance.

— Containers parked overnight, at weekends or public holidays must be located in such a manner that prohibits the container doors from being opened.

*See* Pl. Exh. 18. Hence the defendants passed up those two security precautions—even though they were aware that the bicycles and framesets were "well wanted cargo," and that two thefts of Trek's bicycles had occurred in the prior three years from trucks hired by OOCL Benelux NV. *See* Pl. Exhs. 14 and 37. Moreover, defendants did not require any comparable precautions or guidelines to prevent the theft of this "well wanted cargo" during truck transport:

Q: ... in the e-mail message, at the bottom of [Pl. Exh. 14] ... you refer to the "well wanted cargo." What did you mean by "well wanted cargo"?

A: I mean by that that sensitive cargo which is, how shall I explain this? Cargo which is sensitive for theft.

Q: In other words, this is a type of cargo, the bicycles in Container 5530016, was known to OOCL as a cargo which is susceptible to theft?

\* \* \* \* \* \*

A: To me personally, yes.

Q: Okay. To you personally. Were there any guidelines in effect at OOCL in October of 1996 concerning the handling of cargo which is susceptible to theft?

A: Not that I know.

Q: Okay. You mentioned in the same e-mail message at the bottom of [plaintiff's Exhibit 14] that this is the third theft which you have had for this customer in three years?

A: Yes, sir.

\* \* \* \* \* \*

Q: Do you know why you mentioned it in connection with this shipment?

A: Yes. I had discussions with our people in the inbound department in Rotterdam and they concerned with the customer, about the fact that they really desire to deliver his container in the afternoon, giving him the possibility to go to the terminal and drive immediately to Spijkenisse.

Q: Did the other two thefts involve thefts during truck transport?

A: Yes, sir.

*See* deposition of Carine Van Cleemput, Cost Control Coordinator and former Assistant Operational Manager for OOCL Benelux NV, Pl. Exh. 13, pp. 34–35. (OOCL Benelux NV was and is the agency in Antwerp for OOCL (UK); *see id.,* p. 6.)

The fact that Trek's consignee requested that the container be delivered at a specific time does not excuse the breach of security by the defendants. *See* Pl. Exh. 13 at p. 35; Pl. Exh. 14. The defendants had a duty to safeguard the loaded container until the actual delivery—and they failed to do this. *See* Pl. Exh. 14. Had they complied with any one of the seven following options available to them, the loss probably would not have occurred. *One.* The defendants could have "tr[ied] to convince the customer to devan his 'well wanted' cargo in the early afternoon" so that the trucker could "pick up the box from the terminal and drive to the factory in Spi-

jkenisse WITHOUT stop." (This is the solution the defendants implemented after the theft.) (*see* Pl. Exh. 13, pp. 48–49; Pl. Exh. 14). *Two.* They could have ordered DeBock to store the loaded container in a secured depot or warehouse overnight. (*see* Pl. Exh. 13, pp. 43, 53–54; Pl. Exh. 17; Pl. Exh. 18). *Three.* They could have insisted that DeBock park the truck in a manner that would prohibit the container doors from being opened when the truck was away from a secured area. (*see* Pl. Exh. 13, pp. 43–44; Pl. Exh. 17; Pl. Exh. 18). *Four.* They could have required DeBock to use a truck with a pilferage alarm on the container or other supplementary security devices (*see* Pl. Exh. 18). *Five.* They could have required the driver to sleep in the cabin of the truck. (*see* Pl. Exh. 13, pp. 43–44, 47–48). *Six.* They could have used a truck driver who resided near the Antwerp container terminal or near a secured parking facility or depot. (*see* Pl. Exh. 13, pp. 53–54). *Seven.* They could have classified the goods as high risk cargo, which would have forced DeBock to transport the load on one of its own vehicles, instead of subcontracting the assignment to Groeninghe, a company that the defendants themselves refused to use because Groeninghe could not "deliver the service [the defendants] want from a trucking company." (*see* Pl. Exh. 14, pp. 46–47; Pl. Exh. 18)

Instead of choosing one or more of those options, OOCL (UK), through its agent DeBock, deviated from the Bill of Lading when it permitted the truck driver to take the loaded container to his house and park it on a public street. This deviation was unreasonable because it "substantially increase[d] the exposure of [the] cargo to foreseeable dangers that would have been avoided had no deviation occurred." *Asahi Am., Inc. v. M/V Arild Maersk,* 602 F.Supp. 25, 27 (S.D.N.Y.1985), *quoting, General Elec. Co. v. S.S. Nancy Lykes,* 706 F.2d 80, 84–86 (2d Cir.1983). Moreover, the defendants themselves acknowledge that their subcontractor was negligent because "the container was [parked] on the public road at the time of the theft, without any supervision or guard." *See* Pl. Exh. 16. Accordingly, I find the defendants liable for the loss of the 301–package shipment of bicycles and framesets.

3.  *Plaintiff's alternative argument*

I believe it is unnecessary to consider plaintiff's alternative argument that the loss may have occurred during the twenty days preceding the reported loss of the loaded container. *See* Pl. Reply Memo. pp. 14–15. Almost all of the evidence presented by the parties indicates that the bicycles and framesets were stolen while they were in Mr. van Camp's custody. Indeed, plaintiff's own surveyor concludes in his report that the "cause" of the loss was "[p]ilferage of the container whilst same was parked unattended during the night of 29/30 October 1996." *See* Pl. Exh. 23. I am aware that the surveyor's finding is based on information he received from the defendants. However, Trek's claim was paid on this basis, and I see no reason to question the surveyor's finding.

## CONCLUSION

I grant summary judgment against all of the defendants except the ship (the first-named defendant). The parties agree that the market value of the unrecovered cargo was $121,943.07 and that the repair costs for the recovered cargo were $1,331.67. Accordingly, I award plaintiff: (1) damages in the amount of $123,274.74; (2) prejudgment interest at the rate of 9% per annum from October 30, 1996 (see *Transatlantic Marine Claims Agency, Inc. v. M/V "OOCL Inspiration",* 137 F.3d 94, 104 (2d Cir.1998)); (3) postjudgment interest computed at the rates described in 28 U.S.C. § 1961; and (4) costs. Plaintiff should prepare the final judgment and a bill of costs, and submit them to the Judgment Clerk.